## UNITED STATES v. ORTH et ux.
### Civil Action No. 881.

District Court, E. D. South Carolina, Charleston Division.

Sept. 4, 1943.

Claud N. Sapp, U. S. Atty., of Columbia, S. C., and Louis M. Shimel, Asst. U. S. Atty., of Charleston, S. C., for the Government.

Stoney, Crosland & Prichard and Paul M. MacMillan, all of Charleston, S. C., for defendants.

TIMMERMAN, District Judge.

This is an action, under Section 15 of the Act of June 29, 1906 as amended—see Nationality Act of 1940, 8 U.S.C.A. § 738—to revoke the citizenship of the defendant Albert Orth and to cancel his certificate of naturalization.

The complaint, in substance, alleges that the defendant Albert Orth was, prior to the 8th day of November, 1900, a native and citizen of Germany; that he entered the United States in April, 1891; that on November 8, 1900, he applied for naturalization to the Circuit Court of the United States for the Northern District of Georgia, then and there representing that he bona fide intended to reside in and become a citizen of this country and to renounce all allegiance and fidelity to any other country, or any ruler thereof, and that he was attached to the principles of the Constitution and well disposed towards the good order and happiness of this country; that on the date last aforesaid he took the prescribed oath of allegiance to this country, wherein and whereby he solemnly obligated himself to support the Constitution of the United States and to renounce and abjure all allegiance to his former country, and the rulers thereof; and that in reliance upon the aforesaid representations and the making of said oath, the said Court then and there entered its order admitting the defendant to citizenship and caused the Clerk of said Court to issue to him a certificate of naturalization.

The complaint further alleges that the said representations of the defendant were false and fraudulent, in that the defendant at the time of making the same was not in fact attached to the principles of the Constitution and did not intend to support the same or the laws made pursuant thereto against all enemies, foreign or domestic; that he did not in good faith intend to renounce absolutely and forever all allegiance and fidelity to Germany, and in fact he did not do so; that the defendant in reality intended to and did retain allegiance and fidelity to Germany; that the defendant's said representations and oath were fraudulently, pretentiously and illegally made for the purpose of gaining and enjoying the rights, privileges, and prerogatives of citizenship without the bona fide intention of assuming the duties, obligations and responsibilities thereof; and that the defendant Anna Orth claims citizenship only by virtue of her marriage to her co-defendant Albert Orth.

By way of answer, the defendant admitted the allegations of the complaint, except so much thereof as alleges that the defendant's said representations were false and fraudulent, that he was not attached to the principles of the Constitution and did not intend to support the same; that he did not in good faith renounce all allegiance to his former country and that he retained allegiance thereto, and that said representations and oath were made by him for the purpose of securing the rights, privileges and protection of a citizen of this country without intending to or actually assuming the duties and responsibilities thereof; and as to such allegations the defendant specifically denied them.

Some of the facts are beyond dispute. Among them are these:

The defendant Orth was born in Germany, of German parents, about 1872; that he came to the United States in April, 1891, being followed here by his parents, brothers and sisters in the same year; that Orth's parents were naturalized in September, 1900, prior to his naturalization in November, 1900; that Orth was married in 1896; that his wife was a native of Germany and came to the United States in 1892, her parents remaining in Germany; that in 1904 Orth purchased the Deutsche Zeitung, a German language newspaper published

in the City of Charleston, S. C., and in the same year established his residence in that city, where he now resides within the jurisdiction of this court; and that, in addition to owning and publishing the Deutsche Zeitung, Orth printed other German language newspapers in the cities of Atlanta, Jacksonville and Savannah.

It further conclusively appears from the record that Orth aided one Gustav Drewes, a German reservist, who deserted the crew of the British Steamship Wingate, which came into the Charleston harbor in August, 1914, after a state of war had been declared between Germany and Great Britain. It appears that Drewes first asked the Captain of the Wingate for a discharge, and was refused, and that he then went to the German Consul in Charleston for advice and was told to stay aboard the ship. Notwithstanding this advice, Drewes deserted, using a small boat obtained from another German (name not disclosed) residing in the City of Charleston, to make his way up the Ashley River where he hid until the Wingate had sailed. Drewes then returned to Charleston, went to Orth and explained that he was a German reservist and a deserter from the Wingate and asked Orth's assistance. Orth gave him a railroad ticket to Young's Island, near Charleston, and 50¢ for boat fare, telling him to go to a Mr. Audell who would keep him. Drewes reported to Audell as directed and was sheltered and given employment. A warrant was issued for the arrest of Drewes and other deserters from the Wingate. The Immigration Inspector, having information that some of the deserters had copies of Orth's German language newspaper, asked Orth if he knew "anything about any of the men or where any of them could be found". Orth replied that one of the deserters had gone to a lumber mill near Walterboro, but he gave no information concerning Drewes, whom he had sent to Young's Island. (See Defendant's Ex. V.)

Orth was charged with aiding the alien Drewes to unlawfully enter this country, but was never tried therefor.

In the American edition of the Deutsche Zeitung of April 1, 1916 (Defendant's Ex. B), there appeared an article entitled, "Starting at the Wrong End", in which resentment was expressed at the National Americanization Committee for issuing an appeal to the foreign language press of this country to co-operate in aiding the immigrant population to enter fully into American life and to understand American ideals. Among other things, this was said: "The foreign language press has been doing that work for years and years. And because this particular press of the country has performed its duty so well not a word has been uttered by the Americans of foreign birth that the United States should help one or the other side of the contestants in the World War. From the beginning * * * naturalized citizens have urged that the United States should maintain strict neutrality and avoid everything which might lead to the loss of the friendship of one or the other of the belligerents."

The implication of this article is that Orth's paper had been and was then advocating non-resentment of Germany's ruthless sinking without warning of our unarmed merchant ships peaceably traveling the High Seas; or to put it more bluntly, that the people of this country should suffer for the promotion of German belligerency. This view finds support in another article in the same issue, entitled, "The War Situation", wherein it is asserted that "the inspired English-American press * * * howls against the submarine war"; and in which reference is made to God's "chosen teutonic Race".

Also in the American edition of said newspaper of June 21, 1916 (Defendant's Ex. A), under the heading, "The Call to Duty", this country's action in sending troops to the Mexican Border was highly praised. Among other things, it was said: "A common enemy threatens the peace of our beloved country: The Mexican government, warmed into life and vigor by the kindness of our government has, like a viper, turned on its benefactor. It has not yet stung the breast that has nursed it; but its hissing is ominous, and to neglect preparedness any longer would be criminal."

It is historically true that Mexico's wrongs against our country were not so grievous as those of the German government, all things considered, yet it nowhere appears that the defendant or his newspaper ever expressed resentment or even mild disapproval of Germany's ruthless destruction of American lives and property on the high seas.

Attention is directed to German language issues of the Deutsche Zeitung. In the issue of April 1, 1916, (Plaintiff's Ex. 6), two articles of interest appear. The first

entitled, "The Protector of Small Nations", purports to detail facts concerning a conference in Berlin among representatives of peoples of divergent nationalities, from Africa to Asia, about two months before. There was no explanation of how Orth or the editor of his paper obtained this apparently inside information. Among other things, this first article states: "At this meeting there were a large number of representatives of small nations who had come to Germany—*often secretly and under great difficulties*—because they hoped to see their comrads freed by Germany." (Emphasis added) Also: "They all believed firmly in a German victory."

The writer purportedly knew something of diplomatic maneuvers in Germany—information that the ordinary citizen of this country would not have. This article did not appear in the American edition of the Deutsche Zeitung.

The second article referred to is as follows:

"The German submarines are now equipped with apparatus for the laying of mines. The enemy, by means of a sufficient number of patrol· boats, used to be able to protect themselves effectively against the former mine layers, but this is impossible against submarines, since such boats are able, under the cover of darkness, to approach close to the enemy shores and lay mines.

"The English waters during the coming months will probably be so filled with mines that all approach to the English coast will entail the greatest danger.

"The mines, of course, give no warning when a ship is sunk as a result of contact with them. This is not expected, either, *regardless of how many Americans may be aboard the endangered ship. * * *"* (Emphasis added)

The defendant undoubtedly knew that Germany was sinking our merchant ships without warning and that war would be the logical result, for defendant's paper three weeks later predicted war with Germany. How then could he, if he were a loyal citizen and attached to the Constitution, express apparent satisfaction, if not glee, at the prospect of American ships being sunk and American lives being lost?

The Deutsche Zeitung of April 8, 1916 (Plaintiff's Ex. 7), carried an article entitled, "Ten Commandments". In it a fervid appeal was made to German-American icans to make contributions and sacrifices for the "old homeland". They were called upon to: "Experience the war from afar, help fight and help win by the sacrifices which you make. Do not claim that you have given enough. See what the German woman has given: her husband at Warsaw, her oldest boy in Flanders and her youngest at Douamount near Verdun. You must imagine that Germany is fighting not only in the trenches and dugouts, but that it must also win in the little streets at home, in the miserable houses of the poor, where it is often so cold and dark, where the needy people live."

Such an eloquent appeal for the "old homeland", when the "new homeland" was on the verge of war with it, could have emanated only from the heart of one who cherished and supported the ambitions of Germany.

On April 22, 1916, the Deutsche Zeitung (Plaintiff's Ex. 8) carried an article entitled, "The Easter Celebration". This article was critical of the President of the United States for delivering an ultimatum to the German government concerning the sinking of American ships without warning. War was predicted as the logical result of the ultimatum, and the position of the United States was described as a "search for bloody profits". The article then continued: "Nevertheless we shall not lose our faith in Him who rules the world. Our might is of no avail, but *God's power is on the side of the German people* and it hurts *us* to see how a stubborn President drives *his people* blindly into an abyss of danger and misery. The *just cause will triumph* in spite of that and 'Be happy, O Christianity' is no empty phrase. Every honest person has as much reason as ever to rejoice in the Resurrection and the promise of the Resurrection because God's victory, the victory of a just cause over lies and deceit, usury and malicious slander, is imminent." (Emphasis added)

Also under date of April 22, 1916, in the column headed "Local Items", the following appeared: "*Our Germans* are slowly beginning to realize that only unity can make them strong and demand respect." (Emphasis added) And by way of contrast: "The *average American* has no more concept of ideals than cattle. He has only one ideal; to become a millionaire. Then, as soon as this goal has been reached, the poor sinner departs from this

life and his laughing heirs spend his ill-gotten wealth. *That is American idealism."* (Emphasis added)

The above quotations express contempt for American institutions and manifest an undying love for Germany, its government and its people, as does also the following from the August 12, 1916, issue:

"—Germany above all (airships)

"—Germany under all (submarines)

"—Germany, Germany above everything."

Having said April 22, 1916, that the President's ultimatum to Germany logically would result in war, the defendant's German language paper, one week later (Plaintiff's Ex. 9), under the title, "The Rifle Club Festival", added this:

*"What German* is there, whose heart does not beat faster when he hears the words 'Rifle Club Festival'?

"When on August 1, 1914, war clouds overshadowed everything, many a person asked timidly, 'What is to become of our *German festivals?'* And the answer came back with a shout, borne on the *spirit of German unity,* 'We shall have them!' *The German character and German nature can never perish* even if (which God in his justness will never permit) Germany should actually ever succumb to the greedy desires of her many enemies.

*"German* spirit, *German* nature, *German* customs, *German* devoutness, *German* culture and *German* science—all these can never perish, and *German* accuracy least of all.

"For this reason we shall celebrate *German* festivals, because all the *German* accomplishments and characteristic qualities which we have mentioned are the greatest possessions of this our adopted Fatherland!" (Emphasis added)

In view of the declarations of the week before that war between the United States and Germany was logically to be expected and that the United States was actuated by a "search for bloody profits", this article gives a bold and defiant notice of the defendant's attachment for all things German.

Under the title, "For Our Fatherland", in the issue of the Deutsche Zeitung of June 10, 1916 (Plaintiff's Ex. 10), the press of this country was belabored because of an asserted anti-German attitude; it was accused of fighting with "lying weapons to break down the high reputation of German virtue, German customs, German freedom and truth."

This article referred to Germans in this country as "our countrymen here". It expressed the view that a favorable press could be of more benefit to the German cause than contributions to the Red Cross, "since the latter helps only a part of *our wounded soldiers or unfortunate widows* while a fearless press would be of everlasting *value to all Germans* in the old Fatherland as well as here". (Emphasis added) Reference was then made to the American press as the slave of Germany's enemies, and winds up with this bit of advice to those of German extraction who thought as the writer did: "A German friendly press in America is therefore of greatest importance; supporting it is by far the best thing we can do for our old Fatherland."

A week later, in the June 17, 1916, issue of the Deutsche Zeitung (Plaintiff's Ex. 11), under the heading, "Patriotic Blossoms", President Wilson and others were charged with insulting German-Americans and belittling their patriotism, and all Germans were called upon to attend a Flag parade so as to disprove the implication of non-patriotism on their part. It was charged that the munition factories in this country were under the domination of England and were hypocritically trying to plunge this country into war for profits, and promised that history would prove German-Americans to be "true patriots in the great moments of world history."

The next article (Plaintiff's Ex. 12) appearing in the Deutsche Zeitung of August 12, 1916, is short, and reads as follows: "The terrible war in the old world which has already lasted for more than two years has shown *us Germans here* how important unity is. *We Germans* must go along hand in hand if we want to accomplish anything; *we* must hold together if we want to show *our opponents* that we are a factor to be reckoned with. Not only the man, but the German housewife must help too, and she can do this by purchasing only in *German or pro-German stores.* Love and returned love show the way to unity and in union there is strength." (Emphasis added)

The appeal here was not for unity among all Americans, or even for understanding; it was to "us Germans" and to "we Germans" to unite, hand in hand, to show "our opponents" that "we Germans" were to be

reckoned with. To whom was reference made in the expression "our opponents"? It is implicit in the declaration itself, in the light of what had been said before, that the reference was to loyal citizens of the United States. If that were not so, why the appeal to "us Germans" to trade only with Germans or pro-Germans?

In the issue of the Deutsche Zeitung of November 4, 1916 (Plaintiff's Ex. 13), under the title, "Why We Are Against Wilson", the administration was again bitterly attacked on the ground that it was unfair to Americans of German descent, saying that the followers of the administration and the press slandered and abused Americans of German descent. It also praised the cultural and other contributions made to the United States by people of German origin, and pointed out that they had fought in the Revolutionary War and in the War between the States. President Wilson was accused of being the candidate of England and Wall Street, and his administration of being unneutral and unjust to Germany, saying, "Germany's every mistake was considered a crime and every crime of England's was overlooked. * * * Threats of war were addressed to Berlin and not to London although they might have more justly been directed toward the latter. * * * All because he (President Wilson) wanted to help England and hurt Germany. In order to help England he was ready and decided to plunge the country into the European war on the side of England, France and Russia. * * * *That is why we are against Wilson.* On the day on which the London Mail declared that President Wilson was England's best ally, *our way was clearly defined.* * * * We are a neutral country. At least we should be and must be one. And we are a free country and want to remain that way forever." (Emphasis added)

Here we have protestations of concern for the good of the United States, but through it all the idea of defense of Germany prevails. No concern is expressed for the fate of the United States except concern that it will not become aligned with Germany. In the same issue a lack of concern for the United States is expressed in these words: "The allies have sent back 2500 cases of defective munitions to their American dealers. So it seems that these friends of humanity cheat, too! That is all right with us. The more openly they place themselves on the pillory of shame,

the better, and worthless munitions will *save German lives, which is the main thing."* (Emphasis added)

"The New Gentleman" is the title of an article appearing in the Deutsche Zeitung, November 17, 1916 (Plaintiff's Ex. 14). This article expresses surprise and regret that President Wilson should have been reelected. At some length it describes the kind of man who should be President and then asks, "Is Wilson that man?", and answers the question with, "Let us hope so!" Also resentment was expressed against the use of the term "hyphenated Americans", and the President was called upon to keep faith with his campaign promises, saying that no one would be happier about it than the German-Americans if he did, but the idea was that he could only keep faith by siding with Germany.

The article entitled, "Club Activities", appearing in the October 27, 1917, issue of the Deutsche Zeitung, advocates continuation of celebrations by German clubs and Societies in the United States, pointing out that there was no reason to discontinue them if political discussions and remarks that might arouse concern were avoided. The view was expressed that loose talk by some could make trouble for the German element which was already laboring under a heavy burden, with humility and dignity.

Another article published in the Deutsche Zeitung, after this country was at war with Germany, December 22, 1917, entitled, "Keep Out of the Army" (Plaintiff's Ex. 16), reads:

"The declaration of war against Austro-Hungary brought with it the exclusion of subjects of that dual monarchy from the U. S. Army into which many young men had already been inducted; a number of them being on their way to camps. A train which was to take a large number of inductees from Greater New York to Camp Upton was stopped at Pennsylvania Station and twenty Austrians who were among the drafted men were sent back home. Similar cases were reported in other districts. Approximately 1000 Austro-Hungarian citizens are at present in army camps will not be discharged. According to statements made by officers, many of these openly acknowledge their enmity towards the United States. A large number will greet their freedom joyously, but will not be too happy to be classed with the enemies of this country.

"It is to be hoped that the young men have learned to keep their mouths shut in the camps and that they will try to do this in their future civilian life in this country too, since there are a number of irresponsible German nationals now in internment camps or prisons to serve as examples of a 'loose tongue'."

The striking thing about this article is that it advises disloyal elements or alien enemies "to keep their mouths shut" in military camps and in civilian life lest they be discovered and placed "in internment camps or prisons". It is not the part of a loyal citizen, especially in times of war, to advise enemies of his country, and a truly loyal citizen would not do so, any more than he would harbor and aid an escaped convict who had promoted the interests of a foreign government by sabotaging his country's shipping interests, or who had conspired to do so.

In addition to the articles mentioned, the defendant read into the record as of the dates and under the titles stated the following from the Deutsche Zeitung:

April 29, 1917, "Danger of War":

"While all feelings are aroused by the threatening danger of war between America and Germany, the Deutsche Zeitung considers it its duty to remind *our esteemed comrads and fellow countrymen* to be peaceable[1]. Agitation will bring nothing but hatred and disunity and the evil fruit of the cursed seed. *We* do not want the war and can do nothing to avoid it. It is known only too well that *we* shall have to live in peace with our American fellow citizens during and after any such unhappy war. Whoever is a citizen of this country must remain faithful to his oath, and whoever is no citizen should fit his behavior to his own conscience and healthy reasoning. In all cases[2], the non-citizen, in case of war, is placed under the present Government, and, as we may imagine, more so than a citizen and as regards a citizen, let him remember Schiller's words, 'Obedience is the citizen's first duty.'

"We remind *our German countrymen* to be manly, noble, to use reason and have faith in God. Let us show that *we* do not want to be ridiculed and that *we* do not deserve to be stepped upon. Let each one do what he can." (Emphasis added)

The expression "our esteemed comrads and fellow countrymen" undoubtedly had reference to Germans, for in the concluding paragraph reference is made to "our German countrymen".

October 27, 1917, "Help Uncle Sam": This article simply explained how hundred dollar Liberty Bonds could be purchased in instalments, and concluded with the admonition that "Everyone can afford that and do his part that way."

Same date, without title: "Have you already bought your Liberty Bond? Hurry up. It's high time to do so. The most important task at the moment is to buy Liberty Bonds and it is very easy to accomplish this task. Everyone no doubt puts aside a few dollars and he can invest them just as well in Liberty Bonds. If you do not have the money to buy a full bond at one time, you can buy it in installments." Also: "It was the intention to receive during the week from the 21st to the 27th of October the written promise of the ladies in the households of the country that they would adjust their kitchens to the requirements of the war. People have particularly in mind a limitation of the consumption of wheat and meat, but since, during this period falls the final week of the Liberty Bond Campaign, at the suggestion of the President, the campaign concerning foodstuffs has been postponed to the week which begins on the 28th of October, so that undivided attention can be given to the sale of bonds. Our German housewives are too patriotic minded to avoid the obligation to support the Government in regard to foodstuffs. Up to then they do a job which is no less patriotic by helping with all their strength the sale of Government Bonds. He who helps his country takes care of himself."

December 22, 1917, "To Our Readers and Friends":

"'Old things tumble; new things forge ahead.' We are using these words from the poet Shiller to announce to our readers and friends and to the business people of Charleston that the Deutsche Zeitung, following the necessity of the times, will cease to appear with the beginning of the coming year.

"From the ashes of this paper there will, however, arise in rejuvenated form, a

---

[1] The translator testified the word might be either "peaceable" or "quiet".

[2] The translator testified that the phrase might be interpreted either "in all cases" or "in any case".

weekly which is to be published in English and will represent, as much as this is in agreement with the fidelity of our adopted country, the policy of the paper published up to now in the German language. The history of the Deutsche Zeitung is full of changing moments and shows situations which once before—fifty years ago—demanded a temporary stopping of publication.

"During the War between the States, when everybody was eager to join the armed forces, the employees of the German Zeitung likewise crowded around the flag and for the duration of the war publication of the paper was stopped. Almost ten years ago the German paper had to go through a period which threatened its further existence, but there were men who assured the continuation of the paper because they realized that if this paper were to disappear, representing the only link between the Germans and their language and mother country, they would suffer a serious blow.

"The present stormy and serious days have made the owner of the German paper decide to fully and completely withdraw from the publishing house. The Southern Printing and Publishing Company has taken over the present publishing firm and will publish a weekly in English which will come up to all demands and expectations. The novel 'His English Wife' will be concluded in the English edition. Should it, however, be the desire of our readers to read a novel published in German in the columns of the new English publication, and should this be in agreement with the policy of the new management, we shall, in that case, try to preserve the German language at least in these columns.

"Hoping that our readers and friends and the business people will be favorably inclined towards this new enterprise and will support it to the best of their ability, we are wishing everybody a Merry Christmas.

"The Deutsche Zeitung

"Albert Orth, owner and publisher."

We have in this article over the signature of the defendant Orth the statement that from the ashes of the Deutsche Zeitung there will arise a successor which "will represent, as much as this is in agreement with the fidelity of our adopted country, the policy of the paper published up to now in the German language". This statement signifies that Orth, the author thereof, fully appreciated that his Deutsche Zeitung had not followed a policy in keeping "with the fidelity" of his so-called adopted country, the United States. Again Orth said in this article that he had been moved to stop the publication of the Deutsche Zeitung because of the then "present stormy and serious days", meaning evidently the war between this country and Germany. That was no occasion for a loyal newspaper, owned and published by one attached to the Constitution and institutions of the United States, to withdraw from publication. Orth likely adopted the course he did because he knew or suspected that his lack of attachment was being questioned, and with good cause.

I next turn to the oral testimony, taking up plaintiff's witnesses first.

*D. B. Scoggins,* formerly a traveling salesman but now a Government employee, testified that in Charleston in April, 1918, he went to Orth's office to solicit business; that while waiting he heard Orth say to someone over the telephone, "Have you read the morning paper?", and after hesitating a little, "We captured Messines Hill or Ridge and run the Yankees off"—"something to that effect. I couldn't remember the exact words—that's been twenty-five years ago." That Orth, on seeing him, inquired how long he had been there. Orth could have seen him had he looked around. That he reported the occurrence to a government agent and made an affidavit as to what he had heard shortly afterwards.

*August C. Neuse,* a former German national and the third assistant engineer on the German ship Liebenfels, and a policeman of the City of Charleston at the time of his testimony, testified that the Liebenfels entered Charleston harbor in August, 1914, was interned and later sunk in February, 1917, to prevent the United States from taking it over; that he served a sentence for participation in the sinking; that he was pardoned by the President and then admitted to citizenship by the Judge who had sentenced him; that Orth visited the Liebenfels about once or twice a week; that he (witness) personally destroyed the engines of the Liebenfels under orders from his Captain; that Orth's last visit to the ship was between Christmas, 1916, and the 27th of January, 1917, before the ship was sunk in February, 1917, but he did not

remember the exact date; that for a few months after internment both officers and men of the Liebenfels had the run of the City, but afterwards only the officers had leave; and that many people visited the Liebenfels while it was interned.

*C. L. Rhodes* testified that he had known Orth since 1930, and had worked for him four years, commencing in January 1931; that he visited Orth and frequently talked with him; that Orth once compared the witness, then a young person, to the boys and girls of Germany; that Orth approved the treatment accorded Jews in Germany and said the races should be separated; that Orth approved the German method of dealing with young people; that Orth said Germany was making progress and implied that he favored the German system of government; and that he heard Orth use the expression, "we German people".

*F. C. Moseley* testified that he worked for Orth for fourteen years and heard him discuss Germany and the United States; that Orth said Hitler was doing great things for Germany, doing things while we were talking; that during a patriotic parade in Charleston, Orth remarked, "All that flag waving and patriotism was nonsense"; and that he frequently heard Orth discuss forms of government and he always sided with Germany.

*T. N. Burgess* testified that he was employed by Orth from 1937 to 1941; that he had seen copies of Mein Kampf in Orth's place of business; and that he heard Orth say that Germany was twenty-five years ahead of the United States.

*C. E. Pope* testified that he had been a contractor in Charleston for twenty-six years, but had known Orth for less than two years; that he did work for Orth after Pearl Harbor; that Orth said it was a shame that we were in the war, that we were dragged into it by the rich and had no business in it; that Germany would never have come against us if we had not gone against her; that this was not our war, and it made his blood boil to think of losing young lives for somebody else; and that we would lose the Philippines and never get them back.

*Harold Patrick* testified that he worked for Orth in January, 1942; that Orth advised him to sell his car, stating that if he didn't the government would take it, and that he (Orth) was going to sell his so the government would not get it.

*A. Barron Holmes, III,* a Lieutenant in the United States Navy, testified that he was an attorney at law before entering the Navy; that on a business mission to Orth's printing plant he discussed the New Deal and Hitler's rise to power with Orth, as well as social reforms in Germany, old age pensions, and such like, and that Orth spoke of how much Hitler had done for Germany and how much more social reforms had advanced in Germany than in this country.

*Harry E. Melton* testified that at a vestry meeting in the Unitarian Church in Charleston in the presence of several others, among whom was J. C. Long, shortly after Orth's return from Germany, a Mr. Moore greeted him with, "How's old Hitler?", and Orth replied, "What do you mean old Hitler, you should see what that man is doing for Germany"; and that Orth also spoke favorably of the Youth Movement and improved highways in Germany.

*Mrs. Carolina Lee* testified that she operated a beauty parlor about fifty feet behind the back yard of the Orth residence in Charleston; that the two properties were separated by a high fence; that she heard a man and woman talking in the Orth yard shortly before the United States entered the present war; that the woman spoke broken English, with a foreign accent; that among other things she heard the woman say, "I'll call the police" and "I'll tell the police on you"; that there seemed to be a quarrel between the two, and the woman accused the man of harboring spies and threatened to tell on him; that the man said, "they could not prove it"; and that she could not see the parties because of the board fence.

*James Horres* testified that he visited Orth's home in 1939 and saw a picture of Hitler on the mantle.

*Dr. William P. Rhett* testified that he had known Orth five or six years professionally and was friendly with him; that he heard him discuss governments, say that Hitler was a fine man and doing something good for the world, that this country was too large, that the South should have won the war and that the United States should be divided up. Further that the German government was thrifty and that the monetary system of this country was wrong; and that we spent too much money on general education and not enough on industrial schools. That his conversations with Orth took place

before the United States entered the present war, and he was impressed that Orth thought the German government was wonderful.

*Eugene Sutter* testified that he was a native of Switzerland and a naturalized citizen; that he had known Orth for ten years and frequently visited in his home; that in the winter he saw Orth once or twice a month; that he met Miss Settles and understood she was not closely related to Orth; that he discussed German governmental policies with Orth before we entered the war and Orth expressed the opinion that Hitler was a good man and would help Germany get on its feet; that he, the witness, told Orth that Hitler was a "louse" and this produced an argument as Orth didn't like it; that he visited Europe in 1937 and met Orth on the return trip; that he told Orth things were going badly in Germany, that the food was bad and that one could get better meals in Paris and Strasbourg than in Germany, and Orth responded that he had been in Heidelberg and Cologne and had got good meals; that Orth insisted there was plenty of food in Germany, just as good as it had ever been; that this brought on an argument; that Orth expressed sympathy with Hitler's government; that every time they talked about Germany they came into "collision"; and that his and Orth's ideas about Hitler and Germany were so utterly at variance it was no good talking to him any more after we entered the present war. The witness further testified that he had seen a picture of Hitler in Orth's bath room and said to him, "Mr. Orth, you happened to put that picture in the right place", and Orth replied, "Ach, that's Hildegarde's picture and we didn't know where to put it, and we put it up there"; and that he asked Miss Settles why she did not become a citizen of this country, and she replied, "That man's out there—Hitler's out there and my family's out there".

Former Senator *Christie Benet,* Chairman of the Alien Enemy Board for the Eastern District of South Carolina, testified that two hearings were given Miss Settles before her internment; that at the first hearing Mrs. Orth appeared as Miss Settles' adviser, and at the second one Orth appeared and testified for her; that Mrs. Orth was asked why she had concealed a note, written in German, in a ball of yarn for Miss Settles while she was in custody and she replied, "It was a mistake"; that

Orth testified that he had a picture of Hitler on the mantle in his home "just like you would put up a picture of Washington and Lincoln". Senator Benet described Miss Settles as an intelligent woman, who spoke English quite well, with a German accent. Continuing, he testified that Orth said that Miss Settles was a daughter of a cousin of his in Germany; that Orth was very evasive when asked about his attitude toward this country; that Miss Settles stated that her father was a German officer, but drew a distinction between an officer in the army and one in the civil government, saying that her father was a political, not a military officer; and that she also testified that she had two brothers in the German army, one of whom had been wounded.

*W. J. Veno* testified that he did painting for Orth at his home and in his office, the last time in his home in 1942; that on this occasion, by way of reference to the gasoline shortage, he said to Mrs. Orth, "I don't know how I'll get around to my work if they cut the gas off", that "it seems we've got plenty of gas but we're losing lots of our tankers, so I see by the papers, and we're short of transportation for the fuel", to which Mrs. Orth replied, "they ought to sink them all"; that Mrs. Orth expressed approval of Hitler's attitude toward the Jews and said that the President should be put out of office and that we should not take in the Jews that Hitler ran out of Germany; and that this conversation occurred after the United States was at war.

I now turn to the testimony of the witnesses for the defendants.

*H. B. McGill,* a resident of St. George, S. C., testified that he had known Orth since 1934, and saw him on an average of once every sixty days; that he talked with Orth about Germany but had never heard him discuss the German government or speak in condemnation of this country; and that Orth never said or did anything in his presence that indicated disloyalty to this country. The witness, a newspaper man, bought his plant from Orth and was still indebted to him.

*C. Rausch* testified that he had known Orth since 1923 and saw him frequently; that he heard Orth say that the people of Germany were thrifty; that Orth compared conditions in Germany on his last visit with conditions there on prior visits; that Orth never discussed the German form of government, or expressed dissatisfaction with

our government, or compared the two forms of government; that he never heard Orth say anything that he thought disloyal and he believed he was loyal to the United States; and that he knew nothing of Orth's conviction in the Federal Court, but had heard of it. When certain articles in the Deutsche Zeitung were read to the witness, he expressed disapproval, but added that it didn't change his opinion of the loyalty of Orth. He further testified that if Orth had condemned our entrance into the second World War and had depreciated our ability to win it, that would shake his confidence in him; that he had not seen Hitler's picture in the Orth home on visits there; and that Orth was an admirer of the German people, and of Hitler until Hitler seized Czechoslovakia.

*Dr. C. F. Wimberly,* a Methodist minister, testified that he knew Orth while he was a resident of Charleston, and had seen him on occasions since then; that he had heard Orth talk about industrial conditions in Germany but had heard nothing that indicated a preference for the German form of government or disloyalty to the United States; and that he did not recall ever hearing Orth discuss the political setup in Germany or in this country.

*L. A. R. Nelson,* the next witness for the defendant, made quite an ado about being forced to testify, claiming that he was an unwilling witness and that he disliked the defendant. I am thoroughly convinced that he was an exceptionally willing witness. Since I give little credence to his testimony, I take scant notice of it here. Suffice it to say that in material respects he was contradicted by Judge J. Waties Waring and Mr. Thornhill, a reputable citizen and business man of the City of Charleston.

*Robert A. Andrews* testified that he had worked in the Office of Military Intelligence, Public Relations and Public Service, a branch dealing with the morale of munition workers in the Charleston Ordnance Depot, for two and a half weeks; that he had known Orth since 1932; that he never heard Orth discuss the German government but had heard him discuss the industry, frugality and cleanliness of German peasants; that he never heard him compare Germany with the United States, or criticize or condemn our form of government; that Orth was interested in social security and the status of the small farmer

and similar subjects; and that he never heard Orth express pro-German sentiments.

*Daniel Ravenel* testified that he was engaged in the steamship and tourist business, and that he had arranged a Pacific Coast travel itinerary for Mr. and Mrs. Orth and Miss Settles. The itinerary was explained and a copy thereof offered in evidence.

*John W. Marget* testified that he was a native of Germany and entered this country in 1893; that he was later naturalized and made a Naval Lieutenant in World War I; that he had known Orth since 1910; that he saw Orth frequently and regarded him as a friend; that he visited Germany in 1939, and he and Orth compared notes on Germany and talked about education and roads; that Orth visited him on the U. S. S. Concord, a supply ship for destroyers with headquarters in Charleston harbor, in 1929; that he never heard Orth criticize the United States or compare it to Germany; and that he never heard Orth say anything that indicated he was disloyal to the United States. On cross-examination he expressed his disbelief of all disloyal statements attributed to Orth saying he had known him too long to believe them.

*Jesse W. Orvin* testified that he was in the Merchant Marine during the First World War; that he had known Orth since 1925 and talked with him occasionally; that he had severely criticized Hitler to Orth without eliciting disagreement; that Orth told him he did not believe in dictatorship; that he never heard Orth express dissatisfaction with the United States or condemn or criticize it; and that he considered Orth a loyal citizen. Further, that he had not tried to find out whether Orth was loyal or disloyal; that Orth told him he had been convicted of harboring escaped convicts but that "he (Orth) didn't realize those fellows were escaped convicts"; that he and Nelson, the unwilling witness above referred to, were good friends and he had helped him buy the printing plant from Orth; and that Nelson still owed Orth on the printing plant.

*Dr. W. H. Boyleston* testified that he had known Orth for eighteen or twenty years, and had visited in his home; that he never heard Orth discuss anything about Germany except internal improvements; that he never heard Orth make a disloyal statement; that he tried to feel Orth out about his loyalty and Orth would not discuss the subject; that he regarded Orth a good citi-

694

zen notwithstanding he had served a sentence for harboring escaped convicts; and that Orth had claimed to him he did not know they were escaped convicts. On cross-examination Dr. Boyleston was asked what reason he had for feeling Orth out about his loyalty, why he picked Orth out to question his loyalty, and he replied, "He may have made some remark that I didn't like". The witness also expressed disapproval of certain disloyal remarks attributed to Orth, adding that he didn't know that Orth had made them, but if he did he wouldn't think him a good citizen.

*W. F. Ostendorff* testified that he was employed by Orth as an accountant on a part time basis; that Orth always showed respect for tax laws and didn't complain about taxes; that Orth was a generous contributor to community charities; that he never heard Orth say anything that he regarded as disloyal or that indicated Orth was pro-Hitler; that he regarded Orth a loyal citizen; that he knew he had been in trouble years ago but didn't know the details; that he judged Orth on his record during the past twenty years; and that he never knew Orth to discriminate against anyone because of race, color or creed. On cross-examination he testified that he knew of the sinking of the Liebenfels and had heard that Orth had been convicted of having some connection with it; that he had not heard that Paul Wierse, editor of Orth's paper, had been convicted; that he had worked for Orth as auditor two mornings a week for eighteen or twenty years; and that he disapproved certain statements attributed to Orth and didn't think a loyal citizen would make them.

*Y. W. Scarborough* testified that he was in the army during the First World War; that he had known Orth since 1925; that he saw and talked to Orth two or three times a year; that Orth only mentioned Germany to him once, right after his return from a trip to Germany; that Orth expressed pleasure at German progress in road building, social security, etc.; that he never discussed the German form of government with Orth and never heard Orth express dissatisfaction with the government of the United States or condemn or criticize it, or compare it with the German government; and that he regarded Orth as a good citizen.

*G. Theo Wichmann* testified that he was a teacher of music and the conductor of an orchestra; that he had known Orth for thirty years; that after Orth's return from Germany in 1937 he said he "had a wonderful trip but it was good to be back home"; that he talked to Orth after his tour to the West Coast and Orth said, "This is a wonderful country, if you've never been West, you should take a trip to realize what we have in this country"; that he heard Orth say, "those damn gangsters over there had now started trouble (evidently referring to the commencement of the present war) and it's going to put the whole world in an uproar and it will take centuries— centuries—to get them back to where they will have the respect of the world"; and that he regarded Orth as a fine and loyal citizen. On cross-examination he testified he knew Orth had been convicted of harboring escaped convicts, but didn't believe he knew that he was doing so; that he was born in the United States of German parents; that he didn't think Orth wrote the articles in his newspaper, and argued the difference between owning and publishing a paper and writing the editorials for it; that he had as much right to think Orth a good citizen as he did that Senator Wheeler and Lindbergh were; that he never read Orth's German language newspaper; that he would have to hear Orth make disloyal remarks before he would believe them; and that Orth told him two days after Pearl Harbor that "those damn gangsters in Germany started the trouble".

*F. J. Salmonsen* testified that he had known Orth intimately since 1918 or 1919; that he did Orth's hauling and had been in his home several times; that Orth visited him when he was sick; that he heard Orth speak of the cleanliness of Denmark and Germany and of the thriftiness of their farmers; that he never heard Orth discuss the German government or the United States; and that he regarded Orth as a loyal citizen.

*Lance Davis* testified that he worked for a company of which Orth was President; that he had known Orth for seven years and Miss Settles for five years; that Miss Settles spent a month with his family in Gainesville and Griffin, Georgia, where he was working on city directories for Orth's company; that Miss Settles never discussed Hitler or Germany; that he and his wife thought she had high ideals and a splendid character; that he never knew Miss Settles to do anything to injure the United States; and that he never knew Orth to do or say

anything to indicate loyalty to Germany or disloyalty to the United States.

*H. W. Hopke,* a banker in Charleston, testified that he had known Orth about twenty-five years, but not intimately; that he came in contact with him at irregular intervals; that Orth told him he had enjoyed his trip to Germany with Mr. Gwynette; that Orth never discussed the German government with him; that he often solicited Orth for contributions to community projects and that he contributed liberally; that he thought Orth was a good citizen; and that he heard more against Orth while in the court room than ever before, and if all he had heard was true he would not regard him as a good citizen, but he was unwilling to condemn him on hearsay. On cross-examination he expressed disapproval of articles appearing in Orth's paper and expressed the opinion that a good citizen would not write them.

*Dr. Robert Wilson,* Dean of the Medical College of Charleston, testified that he had known Orth for twenty-nine years professionally; that he never knew either Mr. or Mrs. Orth to do or say anything that indicated disloyalty to the United States; and that he had seen Miss Settles and she appeared to be a sweet, innocent young girl.

*Kenneth Bristol* testified that he was a brother of Vice Admiral Bristol, United States Navy; that he solicited Orth for contributions for community and charity projects and Orth was quite generous and had shown no disinclination to help a movement on account of race, color or creed; and that Orth never expressed any un-American sentiments in his presence.

*George Sahlmann* testified that he was employed by Orth from 1910 to 1943; that he started work as an apprentice and wound up as foreman; that he never heard Orth speak critically of the United States, and never knew him to do anything un-American.

*Sam Levine* testified that he was in the United States navy for thirty-one years, and had a son in the navy; that he was employed by the South Carolina Power Company and often went to Orth's office to read meters or deliver bills; that Orth showed no disinclination to deal with him because he was Jewish; and that he never heard Orth say anything that was un-American.

*Dr. Paul S. Delattre,* a naturalized citizen, testified that he was a native of France; that he had been in Switzerland, England and Haiti before coming to the United States in 1922; that members of his family are in the armed forces of this country; that he had nephews in the French army on the outbreak of war; that he was a naturopathic physician; that he first met Orth professionally, and talked to him about his trip to Germany in 1937; that Orth said the young people of Germany were taught to like Hitler but the older people distrusted him and Miss Settles' father had no use for him; and that he never heard Orth express any un-American sentiments. In his direct examination Dr. Delattre made reference to Orth talking low about Hitler when Miss Settles was near, and on cross-examination he was asked why, and replied, "Hitler has ears in America".

*Mrs. Minnie A. Rausch* testified that she had known the Orths since 1922 or 1923, and that they exchanged visits; that she thought the Orths loved this country; that she asked Mrs. Orth why she did not visit Germany and she replied, "I want to see our country first"; that Mrs. Orth was enthusiastic about her trip West and advised others to take it; that Mrs. Orth didn't discuss politics and she had never heard Orth do so; that in her opinion the Orths were true Americans; that Miss Settles appeared to be highly educated and a perfect lady; and that Miss Settles had shown her pictures of the Western trip, scenes in Chicago, Colorado, California and Mexico.

(Here it may be noted that the itinerary of the Western trip introduced in evidence did not show Mexico on it, nor did either of the Orths mention Mexico as one of the places they visited).

*Miss M. L. Morris* testified that she was employed by Orth for two years, until September, 1942; that she exchanged visits with the Orths; that her parents bought a home from Orth and she usually made the payments; that Orth never discussed Hitler or Germany with her; that she never heard him say anything indicating disloyalty; that she "heard him uphold the Constitution, especially freedom of worship and freedom of speech"; and that early in 1942 "he (Orth) gave all of his employees a government Defense Bond."

The defendant *Mrs. Orth* testified that she last went to Germany in 1905 to see her

parents; that a nephew visited her in 1926 but returned to Germany; that her husband assisted the Obenkirchens to come from Germany to the United States in 1910, and that she and her husband built them a home and furnished it; that the Obenkirchens now have a son in the United States Army; that her husband went to Germany and learned that Miss Settles' people were in poor circumstances and that her father had lost his position because he did not vote for Hitler; that Miss Settles came to the United States in 1937, shortly before her husband and a Mr. Gwynette left for Germany; that Miss Settles was a very obedient and truthful girl and had been brought up in a Christian home; that she (the witness) was very much attached to Miss Settles because of her loveable disposition; that Miss Settles had no bias or prejudice against Jews and loved America very much, thought it a wonderful country; that when asked, "Do you love America?", she replied, "Very much; * * * There are a lot of beautiful things here that we haven't got"; that Miss Settles' picture of Hitler was taken from a newspaper or magazine, because Hitler looked like Charlie Chaplin, whose pictures she liked; that she bought a camera for Miss Settles; that she, her husband and Miss Settles went on an automobile trip to the mountains of North Carolina in September, 1939, and from there to the Exposition in New York; that Miss Settles kept a complete log of the trip; that they later went to the West Coast, and were late in returning because they visited friends in Atlanta, Georgia; that they were late in returning from the Western trip because she was sick in a hospital at Sacramento for a week; that Miss Settles took pictures on this trip as she had on the first trip; that Miss Settles lived in their home and slept in the room with her, and they had gone to bed the night the officers came to arrest Miss Settles; that Miss Settles had not done anything against this country to be arrested for; that she wrote the note to Miss Settles that was discovered in a ball of yarn by the officers to ease the mind of Miss Settles because she was very nervous—it was a note of encouragement; that the words "little piece of paper" used in the note referred to citizenship papers; that she knew the witness Veno, but she did not make the remarks attributed to her by him; that she had never done anything against the United States; that she believed in freedom of speech and worship, and opposed racial discrimination; that she intended nothing against the interests of this country by the note to Miss Settles; that she opposed dictatorships and believed in the United States; that she had no love for Hitler and could choke him; and that she knew of no action of Miss Settles inimical to the interests of the United States.

On cross-examination the witness testified that Miss Settles had not done anything and the government had no charge on her; that Miss Settles came to the United States by permission, not as an immigrant or refugee; that Miss Settles made no effort to become a citizen because her parents were in Germany; that the government kept Miss Settles in a hotel after the night of her arrest, and she had no complaint against the members of the Alien Enemy Board; that she thought the government should not have taken Miss Settles away at night, although she did not know how many enemy aliens the officers had to arrest in Charleston that night; that Miss Settles is well educated, well brought up, and perfect in anything she undertakes to do; that she studied photography so she could get work; that Miss Settles did not work for Hitler; that she did not talk to government's witness Veno about anything except work, never about war or government; that they did talk about gas and she said, "if he didn't get any gas he could go back and forth on the bus"; that when asked if she said to Veno she hoped the Germans would sink all of our tankers, she replied, "Why should I say that, that's an idiotic remark to make"; that she knew no reason why Veno would attribute an untrue remark to her, except "There are lots of evil minds among people these days", and "somebody might put him up to that"; that Veno had no reason to do so but that he lied when he quoted her as saying, "They ought to remove the President * * * and that he put us in the war"; that she didn't know why Veno, or anyone, should question their loyalty as they had always done their share and more; that her husband didn't aid escaped convicts from Atlanta, "he fell in a trap, another man was supposed to be tried in his place"; that the escaped convicts did not come to their home under the names of Fay and Knobloch; that she knew no reason for Knobloch's coming to them unless he was sent by the German Consul; that when asked why the German Consul picked their home to send convicts

to, she answered, "Mr. Orth was in the newspaper business, our soldiers in China would not go to a Chinese newspaper—they would go to an English newspaper to get a newspaper"; that the German Consul didn't say they were escaped convicts when he sent them; that they came with a note from the German Consul; that she and her husband never had anything to do with criminals and if her husband had known then what he knew afterwards, he would have turned them over to the authorities; that she didn't believe her husband had criticized Knobloch for leaving Fay; that Wierse and her husband ran the German language newspaper, but she didn't know that they were friends; that Wierse was just a paid employee, "a very intelligent man and Mr. Orth said 'you know what to write'"; that Wierse and her husband were associates for years; that Wierse was convicted of complicity in sinking the Liebenfels through the German Consul Jahnz, but he was an innocent man; that she and her husband knew the German Consul well and he visited their home; that she had never seen the German Consul from Atlanta or New Orleans; that the Consul who sent Knobloch to them lived in Charleston; that Miss Settles was twenty-five years old June, 1942; that her husband's picture of Hitler was sent to him on a post card; that the witness Horres lied when he said he saw a picture of Hitler on the mantle in the living room, as "We have no mantle" and both pictures of Hitler, Orth's and Miss Settles', were upstairs; that Miss Settles' mother and Orth's father were first cousins; that her husband visited Germany in 1936 and 1937; and that he left for Germany in 1937 in about two weeks after Miss Settles' arrival.

On re-direct examination Mrs. Orth testified that Miss Settles helped with her housework; that Miss Settles left school to work after her father lost his job for not voting for Hitler; that she could get nothing to do except photography and had worked for a photographer in a minor capacity; and that Miss Settles was thorough in whatever she undertook, and had to work about three years before she could earn any worthwhile pay in Germany.

*Herold Petit* testified that he was a Captain in the State Guard; that he had known Orth for fifteen years and saw him about once a week; that in February 1941, or 1942, a person claiming to be a member of the Royal Canadian Air Force and a

newspaperman was stranded in Charleston and Orth contributed ten or fifteen dollars to help him get away.

*Albert Orth* was perhaps the most important witness for himself. His testimony substantially corroborates statements hereinabove concerning his arrival in this country, his marriage, naturalization, place of birth, family relations, etc. After his naturalization Orth made several trips to Germany, in 1904, 1926, 1929, 1936 and 1937.

Orth testified that he owned and published the Deutsche Zeitung and printed other German language newspapers in Atlanta, Savannah and Jacksonville. He offered in evidence the naturalization certificate of his late father and a photograph of the tomb of his parents in Wilmington, Delaware; and he stated that Captain Harry W. Orth, United States Army, was his nephew and that he had other blood kin in the Armed Forces of this country. Orth gave up the publication of the Deutsche Zeitung in December, 1917, while the First World War was in progress, and afterwards sold the files thereof to the Congressional Library. He was a liberal contributor to community projects and charities. In regard to the mentioned articles appearing in his German language newspaper, claimed by the Government to be decidedly pro-German and anti-American, Orth said they were written by his editor and not by himself, that others wrote or orally expressed similar views, and that he only exercised his rights as a citizen in trying to keep this country out of the First World War. He described his editor, Wierse, as a very good, intelligent, fluent and gifted writer, and said Wierse was employed by him until a few months before the publication of the Deutsche Zeitung was discontinued. Also that Wierse was convicted of complicity in the sinking of the German ship Liebenfels, and that he was Secretary to the German Consul in Charleston at the time he was editor of the defendant's German language newspaper.

When asked about his own conviction of harboring the escaped convicts, Knobloch and Fay, Orth stated that Knobloch came to his home in September, 1916, shortly after the escape, under the name of Albrecht, with a letter from a party in Savannah. While it is not specifically so stated by Orth, it is inferable from all the testimony that "the party in Savannah" was the German Consul and the publisher of the

698

German language newspaper in Savannah. (Here it may be noted that Mrs. Orth testified that Knobloch brought a letter from the German Consul in Charleston) Orth admitted that Knobloch (or Albrecht) told him the story of his and Fay's (or Peterson's) escape from the Atlanta Federal Penitentiary, and asked for financial aid, but said that he didn't give him any money, only gave him the names of German Clubs in Charleston; and that Knobloch returned to him the next day with money ostensibly collected from one of the German clubs and asked for more, whereupon he told Knobloch: "You are pretty well fixed. Now, listen, if you are really what you told me you are, they are going to get you before you get to Baltimore". Orth also testified that, notwithstanding his conviction, he had not harbored the escaped convicts, that "as far as I am concerned, I didn't know Fay, I never saw Fay, he said he came to my office—he might have come under a different name—he might have used a different name, quite a lot of people come here". Further, Orth said that he asked the German Consul why he sent those men to him, and that the German Consul said, "so and so", to try to get work, and that he didn't know that the story told by Knobloch was true. That he supposed the reason the German Consul sent the escaped convicts to him was because Paul Wierse, the editor of his paper, was the Consul's secretary.

In testimony at his trial for harboring the escaped convicts, Orth said that he didn't aid Knobloch "because I had too much of them, too many of them; I told him I had too many of this class, and that I could not help a man that was able to work * * *, that I would not be able to assist him any more", and that he gave the names of German societies because Knobloch asked for them and he thought Knobloch was a German. When asked why he did not report the presence of the convicts to the police, he replied: "I did not give it any thought; I did not think about this because, because I had so many things on my mind to attend to." And when asked why Peterson (or Fay) came to him, Orth replied, "this man came to me—there were three of them, they came to me I think it must have been during the middle part of September, or around the twentieth". Orth admitted that Peterson (or Fay) worked in the back yard of his printing establishment for about three days, but said he didn't know who he was until

told by Knobloch. He again admitted that he did not report the escaped convicts and gave as a reason for not doing so that he was not certain who they were, or, as he expressed it, "I had no positive proof". He further stated that he might have read about the escapes in the newspapers. He acknowledged that government agents interviewed him about Fay in October, shortly after the escape, exhibited a picture of Fay and asked if he knew anything about Fay and that he replied, "I told them I didn't know, I never had seen them". He also admitted that he didn't give the officers the information about Fay that he got from Knobloch, because he didn't know that "Knobloch was telling the truth".

Orth bought government bonds during the First World War and advised others to do so through his newspaper. He denied that the witness Scoggins was in his office in April, 1918, when, as that witness testified, he made gloating remarks about Germany's successes and this country's losses in the war. He offered in evidence newspapers showing that our soldiers were not engaged on Messines Hill at the time in question, but these papers did show claimed German successes at Messines Hill, and other places, including a victory over the Americans at St. Mihiel. It doesn't necessarily follow that the news articles mentioned contradict the witness Scoggins. It had been twenty-five years since the incident when Scoggins was testifying, and besides the defendant may have been confused himself about the exact facts. The essence of the story is that Orth was joyous over Germany's claimed victories and America's claimed setback. The newspaper reported both claims, at Messines Hill and St. Mihiel.

Orth recalled many of the instances testified to by Government witnesses and offered explanations of most of them. For instance, the Government's witness Pope testified that Orth said, *after our entry in the present war,* that we had been dragged into it by the rich, that we had no business in it, that Germany would not have bothered us if we had not bothered her, that it made his blood boil to think of losing young lives in such a war, and that we would lose the war and not get the Philippines back. Orth claimed that what he had said was, "that's pretty bad—a terrible thing", that "it's a pitiful thing to think all of this iron for four or five years has gone into Japanese hands," that "it's going to be

a terrible war—it's a terrible situation", and that he had only repeated Commentator Kaltenborn to the effect that it would take time for us to prepare for war and retake the Philippines. Orth did not deny that he talked with Pope; he only varied the text of what was said. I am convinced that, as between the two, Pope is the more worthy of belief. There was no charge that Pope is interested in the outcome of this case, or that he was biased against the defendants or either of them.

In explanation of Mrs. Lee's testimony Orth stated that neither Miss Settles, nor anyone else, had ever threatened to call the police and report him for harboring spies, and that he knew no reason for Mrs. Lee stating that such an incident occurred in his back yard. Mrs. Lee appeared as free of interest and bias as did Mr. Pope and others testifying for the Government. In fact, Mrs. Lee appeared to be an unwilling, or a regretful, witness.

Without tediously reciting all that Orth said in reply to the testimony of witnesses for the Government, let it suffice to say that he denied outright some of the statements attributed to him and explained others, but he made no attack, direct or indirect, on the credibility of the witnesses for the Government, unless it was on the witness Melton, to whom reference will be made hereinafter, nor did he suggest any reason for their testifying falsely against him.

*J. C. Long,* an attorney of standing at the Charleston bar and the last witness for the defendants, was placed on the stand primarily to contradict the testimony of the Government's witness Melton, who had testified that at a church meeting a Mr. Moore had greeted Orth, right after his return from Germany, with "How's old Hitler?", and that Orth had replied: "What do you mean by old Hitler? You should go and see what that man is doing for Germany." Melton said that Long and several others were present when this occurred. Mr. Long testified that the incident did not occur in his presence. Mr. Long also testified that he never heard Orth say anything that he regarded as disloyal; that Orth was a liberal giver to church and community projects; and that he had heard him express himself in favor of citizens exercising the right of suffrage. Whether or not Orth made the statement credited to him by the witness Melton is of little or no importance. However, the incident could have happened without Mr. Long hearing it. Seldom does one ever hear and remember all that is said by each one present in a gathering of people. Besides Melton could have been mistaken about Mr. Long being present at the time in question.

It was argued, concerning the incident of the desertion of the German reservist Drewes from the Steamship Wingate and his subsequent unlawful entry into this country, that the testimony is indefinite as to when the Immigration Commissioner interviewed Orth, whether before or after Drewes had been to Orth for help. If this evidence is indefinite, it was left that way by the defendants. They offered it and Mr. Orth was in full possession of all the facts. But what difference does it make? If the Commissioner asked Orth about Drewes after Orth had sent him to Young's Island, then it was Orth's duty as a loyal citizen to disclose the whereabouts of Drewes to the Commissioner, and he would have done so had he felt free of culpability. On the other hand, if Orth did not see Drewes until after the Commissioner had asked about him, then undoubtedly Orth deliberately secreted or aided in secreting Drewes when he knew he was charged with violating the immigration laws of this country. Regardless of which end of the horn Orth takes, he finds himself in a dilemma.

As to the German S. S. Liebenfels, interned in the Charleston harbor from August, 1914 until just prior to America's entrance into the First World War when it was sunk by its crew to prevent the United States Government taking it over, it is not denied that Orth was a frequent visitor thereon until just a short time before it was sabotaged. The testimony is that he visited the Liebenfels once or twice a week to within a short time before it was sunk. This testimony was given by a naturalized citizen, now a policeman in the City of Charleston, who was a member of the crew of the Liebenfels. This witness testified that Orth visited the officers of the Liebenfels. Whether or not Orth knew that the ship was to be sunk, it is significant that he ceased his frequent visits thereto a month or several weeks before the actual sinking. In this connection it should be remembered that Orth testified that Paul Wierse, the editor of his German language newspaper and the secretary to the German Consul, was convicted of complicity in the

sinking of the Liebenfels and served a sentence therefor.

"In 1916 one Knobloch, who had escaped from the Atlanta Penitentiary with Captain Fay called on Mr. Orth, who gave him no financial assistance, but did direct him to a German organization where he might get help and did not report him to the authorities. Captain Fay was a man who had been convicted of placing bombs on ships and was a German Army Officer. Whether or not Mr. Orth ever saw or helped Fay is a little doubtful as the only evidence of this is testimony as to statements allegedly made by Orth. Orth denied and still denies that he ever saw Fay. However, Orth was convicted of aiding both men and it must be taken as true. He served his sentences for these offenses." The above quotation is from the proposed "Findings of Fact" submitted on behalf of the defendants; and all of it may be adopted, except so much as says, "Whether or not Orth ever saw or helped Fay is a little doubtful as the only evidence of this is testimony as to statements allegedly made by Orth". The Court does not regard the testimony doubtful about Orth's seeing and helping Fay. His own testimony is hardly susceptible to any other reasonable inference than that he did see and aid Fay.

As shown above, Knobloch, another of the escapees, who certainly had no interest to serve by testifying against Orth, said that Orth told him that he had seen Fay and that Fay was not using his assumed name of Sanderson, as he (Orth) had "christened him Robert Peterson", and that Fay had told him (Orth) that he had a new bomb, one "much smaller than the one he used before".

Also the witness A. A. Arndt testified at Orth's trials in 1917 for harboring Fay and Knobloch, that he saw Orth on September 29, 1916, after the escape of Fay and Knobloch earlier in that month, and that in the course of a conversation he remarked to Orth that it was strange that men could escape from the Atlanta Penitentiary, whereupon Orth said, "Would you believe me if I told you that Mr. Fay and the man that escaped with him was in my place of business not ten days or two weeks ago?" Arndt then told Orth that he had made a dangerous remark which might get him into trouble, to which Orth replied that his oath was as good as the witness' and that if what he had said was repeated he would say it was a lie.

The fact that Orth was convicted in this Court in 1917 of knowingly and wilfully harboring both Fay and Knobloch, which convictions were upheld in the Circuit Court of Appeals, (Orth v. United States, 4 Cir., 252 F. 566; Orth v. United States, 4 Cir., 252 F. 569), leaves no reasonable doubt of Orth's guilt of harboring and concealing Captain Fay of the German Army, who had been convicted of a conspiracy to sabotage American shipping by the use of bombs. In this connection it might be well to remember that Mrs. Orth testified that her husband "fell in a trap, another man was supposed to be tried in his place". Just what was meant by that statement is not entirely clear, but it does leave one to wonder whether the German Consul, who sent Fay and Knobloch to Orth, promised Orth that he would be shielded to the extent of procuring someone else to take the "rap" for him.

The record is replete with statements attributed to Orth from 1916 to 1942 indicating a lack of attachment to the Constitution of the United States and evidencing an attachment for German interests. Little weight would be given to one or two, or even a half dozen, isolated loose statements critical of the general policies of this Government, but here we have quite a number of statements from the defendant Orth, some of them connected in point of time, and all of them pointed to the same general conclusion. Yet if we had no more in the record than the many allegedly disloyal statements credited to the defendant and his explanations and denials thereof, the Court might not feel warranted in saying that the Government had established its case by "clear, unequivocal and convincing evidence". That, however, is not the case. In addition to the alleged oral utterances of the defendant, we have his conduct and the written statements published in his German language newspaper. It is from all these sources of evidence that conclusions must be drawn.

The Court is not unmindful that a number of representative citizens testified that they had never heard Orth utter a disloyal word or do or say anything that indicated to them that he was not a good and loyal citizen, but this testimony is negative in character. Many of those witnesses saw him only occasionally and usually on business, and a few others were either very close friends or business associates. Besides many of the defendant's witnesses

were of a character that would have caused Orth to hesitate to express in their presence ideas that were not entirely loyal and that would mark him as one favoring or serving the interests of a potential or actual enemy of the United States.

The Court is impressed with the frequency of Orth's visits to Germany. It should be remembered that the defendant claimed no ties in Germany on account of business or kinship. According to his own statement all of his immediate family migrated to the United States before he was admitted to citizenship; only distant relatives for whom he expressed no special attachment and concern and of whom he knew very little remained in Germany. He went to Germany in 1904, either just before or just after he purchased the German language newspaper in Charleston, it is not made plain which. The First World War intervened in 1914 and he did not return to Germany until 1926. After the First World War conditions in Germany were very uncertain and for a while the Army of Occupation was there. Then, too, Orth had only recently been in the clutches of the law here. Following his visit to Germany in 1926, he went again in 1929. At that time all of his known business, social and kinship ties were in the United States, and he has not satisfactorily explained why he visited Germany in either of those years. Neither does he explain why he returned to Germany again in 1936, but he does say it was then he became interested in bringing Miss Settles to the United States. He explained his interest in Miss Settles, a very intelligent and accomplished young woman, by saying that neither he nor his wife had any "direct relatives" in this country and that she was a distant cousin whose presence might be a comfort to his wife. He evidently overlooked his other testimony to the effect that all of his brothers and sisters, and their children, were in the United States. According to Orth himself Miss Settles is only a second cousin, and according to Mrs. Orth she is only a third cousin, although Orth did refer to her as his niece the night the officers arrested her as an alien enemy right after Pearl Harbor. Orth showed an extraordinary interest in having Miss Settles admitted to the United States. He corresponded with the American Consul in Germany about it, paid her passage over and posted a bond of $5,000 with the Government to gain her admittance; and, as he says, he had only seen Miss Settles once as a child, presumably on his visit in 1926, as she is now twenty-six years old. She was not born in 1904.

From all that has been said of Miss Settles she is a young woman of personality, training and intelligence. She is an efficient photographer and speaks English well, even if with a foreign accent; and Mrs. Orth testified to her capacity for doing things effectively and efficiently. She is peculiarly fitted for serving the interests of her native land in a country such as our own, where the movements of aliens are not so closely watched as in the old countries. Considering the time that Miss Settles came to the United States and the circumstances of her coming, the question of why she came naturally arises. The defendants do not claim that she came here intending to make this country her home, or that she intended to apply for naturalization; and certainly she made no move in that direction in the more that four years she was here. One inquisitive witness asked her why she did not apply for citizenship and she replied, "That man's out there—Hitler's out there —and my family's out there". That answer does not explain in view of the fact that she left Germany at a critical time and came to this country to live in the home of a former German national, and the further fact that her father is a German civil officer and both of her brothers are in the German army.

At the time of Miss Settles' arrival in the United States international relations with Europe were growing tense and thoughtful people were then apprehensive of the results to follow, and Miss Settles had been here barely two weeks before Orth left for Germany again. It is true that Orth says that he went with a Mr. Gwynette who had fallen heir to an estate in Germany to help him spend in Germany his German inheritance, because he could not bring it out of Germany. That explanation is not impressive. Orth supposedly had business interests here that needed his attention. He was not a subject of charity; and he had been in Germany only the year before. War followed soon after these events and we find both Orth and Miss Settles with pictures of Hitler in the Orth home. Orth explained their possession of the pictures of Hitler to the Alien Enemy Hearing Board by saying that they had them "just like you would put up a picture of Washington and Lincoln". We

in the United States put up pictures of Washington and Lincoln and others of our notables because they are symbolic of our ideals and institutions and represent the best in American tradition. When that statement was made United States soldiers had already spilled blood in battle in a war in which Germany was our enemy.

Orth was quite non-cooperative when the federal agents went to his home to serve a warrant of arrest on Miss Settles as an alien enemy. It was then that he referred to her as his niece and declared that she had done nothing. He first refused to admit the officers to his premises and only did so when he was convinced that they would use force to gain admittance. From his ·experiences in the First World War Orth had every reason to believe that Miss Settles would be interned as an alien enemy when this country became involved in the present war. Orth's belligerency toward the officers was manifested both before and after they had explained their mission to him, and he persisted in that attitude as late as the first hearing accorded Miss Settles by the Alien Enemy Hearing Board in the City of Columbia some days after her arrest, as may be seen by reference to the testimony of federal agent Donahoo. After Miss Settles had been arrested Mrs. Orth was given permission to carry or send her extra clothing and other personal articles. She abused this courtesy by concealing a note to Miss Settles in a ball of yarn and the note was discovered by a watchful deputy before the yarn and other articles were delivered to Miss Settles. The note was in German, and as translated it read as follows:

"Dear Hilda:

"Don't be afraid of anything the Inspector does and don't answer anything you don't understand. Early tomorrow you are to be taken to Fort outside of Savanah. Keep up your courage, dear child, and don't let it get you down. You haven't done anything against this country, so just be brave. We are going to visit you. The little piece of *paper* would have saved you that.

"Both of us are very unhappy about it. I can say only that it hurts me terribly to have you in this situation. Keep your chin up."

Mrs. Orth testified that she meant no harm by the note, that it was only a note of encouragement and explained that the words "little piece of paper" used in the note had reference to citizenship papers. That signifies, if we accept the statement as true, that there had been some discussion between the Orths and Miss Settles about naturalization, but it does not explain the character or purpose of the discussion.

Orth has been in the United States for practically fifty years and naturalized for more that forty years. Since naturalization he has visited Germany a number of times. Before Miss Settles came to America, neither he nor his wife had ever evidenced any interest in traveling over the United States. ' After Miss Settles came they took two extensive trips, one along the Eastern Seaboard and the other along the Western Seaboard. On both trips Miss Settles bought and took pictures of places visited. Both Mr. and Mrs. Orth testified that none of the pictures was of military value and offered to show them. It is hardly to be expected that they would produce pictures having obvious military value to Germany or any other foreign country.

The articles published in Orth's German language newspaper speak for themselves. It would be hard to understand how an unbiased reader of those articles could reach any other conclusion than that Orth sided with Germany against the United States. It is quite evident from them that Orth was critical of public officials of this country because they did not acquiesce in Germany's disregard of neutral rights. Furthermore, he spoke of "we Germans" and of "us Germans", and he referred to "our opponents" when the context clearly implied that the reference was to citizens of this country who did not sympathize with Germany's mad fight to become the world's dominant power. In these articles secret parleys in Berlin were referred to and the boast was made that Germany had planted deadly mines in England's waters that would sink all ships without warning, "regardless of how many Americans may be aboard the endangered ships". In one of these articles war between Germany and the United States was prophesied, and that was followed with the assertion that "God's power is on the side of the German people". Citizens of the United States were appraised in this language: "The average American has no more concept of ideals than cattle." To Germans and pro-Germans this appeal was made: "We must hold together if we want to show our opponents that we are factors to be reckoned with"; and, epi-

gramatically, loyalty and fealty to Germany was summarized in these words:

"Germany above all (airships)
"Germany under all (submarines)
"Germany, Germany above everything."

This much and more was published in Orth's German language newspaper in 1916 while war between the United States and Germany became more ominous with each passing day.

Even so late as April 29, 1917, the Deutsche Zeitung carried an article entitled, "Danger of War", which concluded with these words: "We remind *our German countrymen* to be manly, noble, to use reason and have faith in God. Let *us* show that *we* do not want to be ridiculed and that *we* do not deserve to be stepped upon. Let each one do what he can." (Emphasis added) "Let each one do what he can" for whom? Since the appeal was to *"our German countrymen"*, it must have been for aid to *our country—Germany*.

Responsibility for these utterances rests upon Orth. It doesn't answer to say that he hired the secretary to the German Consul to do his writing and that the words used were words of his editor. Orth was the owner and publisher of the newspaper and responsible for what went in it, especially since he did not seasonably repudiate what was published in his name. Besides I am convinced that the sentiments expressed were his own.

■ It was argued that, even if the sentiments expressed be accepted as those of the defendant, he is protected by the constitutional guarantees of free speech and free press; and so he may be as to the right to express them, but that doesn't mean that the statements did not manifest a lack of attachment for the Constitution of the United States and his allegiance to Germany. A man who makes violent threats against another and afterwards slays the one threatened cannot invoke the Constitution to protect him from proof of such threats on his trial for murder, notwithstanding he may have exercised the right of free speech when the threats were made. It is not an abridgment of free speech to test a man's faith or attitude by what he says freely, openly and deliberately.

After the arrest of Miss Settles, Orth was interviewed by federal agents who testified that he was evasive when asked concerning his attitude toward this country and Germany and the purpose and meaning of the articles that appeared in his German language newspaper. Mr. Benet, of the Alien Enemy Hearing Board, testified to a like attitude when Orth appeared as a witness for Miss Settles. Orth admitted to the federal agents that he helped finance a tour through the low country of this State in 1935 for officers from the German cruiser Karlsrhue then on a visit in Charleston harbor, but he declined to tell who else contributed to the expense of the tour, saying it was "no use to draw their names into it." Orth also told the federal agents that his attitude toward this country had not changed since he was admitted to citizenship, that it had been the same at all times.

It is urged in Orth's favor that he purchased government bonds during the First World War and through his newspaper advised others to do so, that he contributed to worthy projects, and that he tendered his printing plant to the Government free of charge after our entrance into the present war. It should be noted, however, that Orth did not make tender of his printing plant to the Government until after Miss Settles had been arrested as an alien enemy in his home. At most, the offer was a mere gesture which Orth had reasons to believe would not be accepted. A similar motive may have prompted him to purchase bonds during the First World War, to advertise their sale and to urge others to purchase them, for it was then that he was investigated and tried for harboring and aiding Fay and Knobloch; and it was during that period that he was otherwise investigated.

■ It is further urged in behalf of the defendant that a long time has elapsed since Orth was naturalized and since the Government knew of many of the facts now relied on to deprive him of citizenship. This could be a persuasive argument if the trial were between individuals, but the doctrine of estoppel does not apply in a case of this character, leastwise no court has said so. In my opinion the fact that Orth has had forty years within which to establish himself as a loyal citizen, attached to the Constitution of the United States, and has not done so, is not in his favor but against him. It may be true that the United States Attorney recommended the institution of denaturalization proceedings against the defendant during or immediately after the First World War and that the Justice Department did not au-

thorize such action, but that doesn't preclude the Government in this case. It is common knowledge that after the First World War the Government extended amnesty to a great many people against whom charges were pending touching their loyalty to this country. Whether this course was wise or unwise is not an issue in this case. Even if it were shown that the Justice Department failed to authorize the institution of denaturalization proceedings against Orth in 1918 or 1919, because the officer having the say in such matters thought the evidence insufficient, that would not constitute a valid defense. Such considerations are beside the point. The Court now has all of the evidence before it, and it is upon that—not upon someone's opinion —that the decision must rest. What is in a man's heart at a given time can be determined by what he does and says afterwards quite as well, or better than by what he did or said at or before the given time. Orth was new to this country when he applied for citizenship and evidently desired very much to be naturalized. Certainly he would not have willingly disclosed information to frustrate his desire to be naturalized, if he had an ulterior purpose in view. On the other hand, after he had been naturalized for a long time, he might feel a sense of security and become careless about divulging his true sentiments. Then too in the very nature of things one's attachment for a new home and country should grow stronger, not weaker, with the passing of the years where the original application for and acceptance of citizenship were in good faith. In the instant case, nothing crucial occurred that would have caused Orth to show his true colors until 1914 and thereafter. Before then nothing had happened to cause Orth to take sides; the United States and Germany were at peace; and no occasion had arisen to cause the general public to discuss relations between the two countries or to be apprehensive about them.

■ I agree with the opinion of Judge Sparks of the 7th Circuit, in United States v. Krause, 136 F.2d 935, 938, filed June 30, 1943, wherein it is said: "The oath of allegiance and the renunciation of former allegiance must be made without mental reservation. If it appear subsequently that the maker fails in allegiance, fidelity or faith, it may be fairly presumed that he did not absolutely and entirely renounce his former allegiance, and this presumption is all the stronger when the period which has elapsed since the oath is longer. United States v. Kuhn, D.C., 49 F.Supp. 407. It is well settled that intent at the time of naturalization may be shown by subsequent acts and declarations." More often than otherwise the acts and declarations of a naturalized citizen after admission to citizenship are the only available means by which his true intentions at the time of naturalization can be ascertained; and the longer the period covered by evidence of a lack of attachment the stronger the evidence is.

No attack has been made on the constitutionality of the Act under which this proceeding is brought. If such an attack had been made the answer thereto would be found in Johannessen v. United States, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066, and Luria v. United States, 231 U.S. 9, 34 S.Ct. 10, 58 L.Ed. 101.

■ The Constitution has vested in Congress the sole power to establish uniform rules of naturalization. Article I, Section 8. With the wisdom of such rules this Court has nothing to do, but it is concerned with giving them a practical, common sense and just interpretation. In doing so reliance must be had upon what men of learning and intelligence, charged with the duty and responsibility of interpreting and applying the Acts of Congress, have had to say on the subjects of the Naturalization and Denaturalization Acts, and also upon subsequent actions of Congress giving tacit assent to the interpretations placed upon said Acts.

■ In the quite recent case of Schneiderman v. United States, 63 S.Ct. 1333, 1341, 87 L.Ed. —, decided June 21, 1943, which is dissimilar to the instant case in point of fact, it was said that the Government had the burden of proving its essential allegations in a case of this character by "clear, unequivocal, and convincing" evidence. Additionally it seems that the following previously established general principles of law applicable to cases of this character were recognized, viz.: That naturalization is a privilege which Congress may allow or disallow on such conditions as it may see fit to impose; that Congress did not intend by the Acts of Naturalization and Denaturalization to circumscribe liberty of political thought; and that to entitle a person to naturalization under the rules prescribed by Congress he must not only behave as one attached

to the principles of the Constitution, but he must in fact be so attached at the time of naturalization. In reaching the conclusions stated herein, the Court has considered itself bound by these legal principles and by others that will be hereinafter mentioned.

 Concerning the requirements for naturalization the Supreme Court in Luria v. United States, supra [231 U.S. 9, 34 S.Ct. 13, 58 L.Ed. 101], very lucidly said: "These requirements plainly contemplated that the applicant, if admitted, should be a citizen in fact as well as in name,—that he should assume and bear the obligations and duties of that status as well as enjoy its rights and privileges. In other words, it was contemplated that his admission should be mutually beneficial to the government and himself, the proof in respect of his established residence, moral character, and attachment to the principles of the Constitution being exacted because of what they promised for the future, rather than for what they told of the past."

In United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 572, 75 L.Ed. 1302, which was decided almost two decades after the Luria case, it is said: "Clearly, it would seem, in order that the court and the government, whose power and duty in that respect these provisions take for granted, may discover whether the applicant is fitted for citizenship—and to that end, by actual inquiry, ascertain, among other things, whether he has intelligence and good character; whether his oath to support and defend the Constitution and laws of the United States, and to bear true faith, and allegiance to the same, will be taken without mental reservation or purpose inconsistent therewith; whether his views are compatible with the obligations and duties of American citizenship; whether he will upon his own part observe the laws of the land; whether he is willing to support the government in time of war, as well as in time of peace, and to assist in the defense of the country, not to the extent or in the manner that he may choose, but to such extent and in such manner as he lawfully may be required to do. These, at least, are matters which are of the essence of the statutory requirements, and in respect of which the mind and conscience of the applicant may be probed by pertinent inquiries, as fully as the court, in the exercise of a sound discretion, may conclude is necessary."

Thus it will be seen that the Supreme Court, in the Luria and Macintosh cases, has made it clear that the requirements for citizenship are more than mere residence in the United States for a designated period and compliance with procedural formalities. It is made plain that in order to entitle an applicant to naturalization, he must sincerely and absolutely renounce all foreign allegiance and give true faith and allegiance to the United States, its Constitution and laws. Also the applicant must be attached to the principles of the Constitution and intend to make the United States his permanent home, where he will fully assume and fully discharge all the duties and obligations of citizenship. If an alien accepts citizenship with a mental reservation as to any of the requirements essential to citizenship, he may lose his citizenship in a denaturalization proceeding upon clear proof of the existence of such mental reservation; and to this end Congress has enacted legislation authorizing the bringing of a proceeding in a District Court to avoid citizenship illegally or fraudulently procured.

In Johannessen v. United States, supra [225 U.S. 227, 32 S.Ct. 617, 56 L.Ed. 1066], the Court said: "An alien has no moral nor constitutional right to retain the privileges of citizenship if, by false evidence or the like, an imposition has been practiced upon the court, without which the certificate of citizenship could not and would not have been issued. As was well said by Chief Justice Parker in Foster v. [President, etc., of] Essex Bank, 16 Mass. [245], 273, 8 Am.Dec. 135, 'there is no such thing as a vested right to do wrong.'"

See: United States v. Ginsberg, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853; United States v. Ness, 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321; Maney v. United States, 278 U.S. 17, 49 S.Ct. 15, 73 L.Ed. 156.

In United States v. Kramer, 5 Cir., 262 F. 395, 397, it is said: "American citizenship is a priceless possession, and one who seeks it by naturalization must do so in entire good faith, without any mental reservation whatever, and with the complete intention of yielding his absolute loyalty and allegiance to the country of his adoption. If he does not, he is guilty of fraud in obtaining his certificate of citizenship."

See: Schurmann v. United States, 9 Cir., 264 F. 917, 18 A.L.R. 1182; United States v. Wursterbarth, D.C.N.J., 249 F. 908; United States v. Herberger, D.C.W.D.

Wash., 272 F. 278; United States v. De Tolna, D.C.E.D.N.Y., 27 F.2d 984; United States v. Ebell, D.C.W.D.Tex., 44 F.Supp. 43; United States v. Mickley, D.C.E.D. Mich., 44 F.Supp. 735; United States v. Baumgartner, D.C.W.D.Mo., 47 F.Supp. 622; United States v. Bergmann, D.C.S.D. Cal., 47 F.Supp. 765; United States v. Fischer, D.C.S.D.Fla., 48 F.Supp. 7; United States v. Kuhn, D.C.S.D.N.Y., 49 F.Supp. 407; United States v. Schuchhardt, D.C.N.D.Ind. 49 F.Supp. 567.

 The acts and declarations of a person subsequent to naturalization are admissible in evidence to show his state of mind at the time of naturalization and to determine what his real purpose was in seeking citizenship. Luria v. United States, supra; United States v. Kramer, supra; Schurmann v. United States, supra; Glaser v. United States, 7 Cir., 289 F. 255; Turlej v. United States, 8 Cir., 31 F.2d 696.

Schurmann v. United States, supra [264 F. 918, 18 A.L.R. 1182], is strikingly like the instant case in many respects, and for that reason I quote quite freely from it as follows:

"In behalf of the United States there was abundant evidence that, before and after the declaration of war between the United States and Germany, Schurmann frequently praised the attitude of the Germans, defended the sinking of the Lusitania, said that he wanted to get over to Germany to be a surgeon in the German hospitals, anything Germany did was justified by her right to be supreme, said that America was wrong in entering the war, and that it was impossible to defeat Germany, advised against 'waste' of money in buying Liberty Bonds, said he wanted to get into Mexico, and by many other remarks indicated beyond any possible doubt that his feelings were entirely on the side of Germany as against the United States, as well as the other countries at war with Germany. * * *

"Was the lower court justified in holding that Schurmann, by reason of his attitude and declarations and expressions during the years 1916 and 1917, before and after the United States was at war with Germany, swore falsely in 1904 when he declared that he absolutely and entirely renounced and abjured all allegiance and fidelity to the German government and emperor. Under the circumstances of the case, the only way of arriving at what the fidelity and allegiance of Schurmann were

in December, 1904, is by trying out his attitude of mind and heart in the later years of 1916 and 1917, when, under then existing conditions men were specially aroused to give utterance to their real sentiments and to avow loyalty to one or another of the belligerent nations. Prior to 1916 his life seems to have been without special event indicative of patriotic feeling. But it was in the crucial times of 1917 that the respondent failed in the fundamental obligation to his oath of true faith and allegiance in 1904."

Also: "One * * * whose frequent expressions were so plainly against the United States and in favor of Germany, must have taken the oath of full faith and allegiance with a reserved determination, to be kept down, but nurtured, until a momentous time might come. In years, however, the time did come, and the criterion of original fraud must be the later conduct, which, in its relation to the earlier attitude, will furnish safe ground for judgment."

It may not matter that a naturalized citizen gives no indication of a lack of attachment, or of retained allegiance to his former country, if there is no occasion for his doing so, but it does matter if a conflict arises between his adopted and native countries and he then demonstrates his allegiance to the latter. If under such circumstances a naturalized citizen shows a lack of attachment for his adopted country and evidences allegiance to his former country, it is fair and reasonable to say that the same non-attachment and allegiance existed when he was naturalized.

In the instant case for fourteen years after his naturalization no condition arose, so far as testimony shows, to test the defendant's attitude or to cause him to express a choice between his old and his new country, but conditions did arise twice afterwards which called for a show of colors, and on both occasions Orth by acts and utterances, spoken and written, showed a lack of attachment for the Constitution of the United States and manifested a retained allegiance to Germany.

In United States v. Kuhn, supra [49 F. Supp. 412], it is said: "On the other hand, each defendant renounced all allegiance and fidelity to his homeland; he agreed to support and defend the Constitution and our laws against all enemies, and his faith and allegiance was to be true. These three requirements preclude any divided concept.

They contemplate full and complete citizenship. It is to be expected, of course, that now citizens will not have completely divested themselves of some sentimental feeling for their old country. It is also to be expected that as the years grow longer after their oath that this sentiment will diminish and their love for their adopted land will increase. United States v. Wursterbarth, supra. The test of how strong those sentiments were at the taking of the oath and how much, if at all, they created a mental reservation or purpose of evasion as to any or all parts of the oath, may be presumed from defendants' subsequent actions and statements. Particularly is this so when the real test comes, when war or dispute between their new country and their old, is imminent or declared. If it appears that they then fail in allegiance, fidelity or faith, it may fairly be presumed that they did not absolutely and entirely renounce their former allegiance, and this presumption is all the stronger when the period which has elapsed since the oath is longer."

See: United States v. Herberger, supra.

 Upon the facts and the law judgment must go against the defendants. To summarize, I make the following findings:

## Of Fact

1. That the defendant Albert Orth was naturalized and admitted to citizenship in the United States on November 8, 1900, by the United States Circuit Court in the Northern District of Georgia.

2. That the defendant Anna Orth is the wife of Albert Orth and has been since before her husband was naturalized and admitted to citizenship as aforesaid; and that her citizenship is derivative.

3. That both defendants are natives of Germany and owed allegiance to the German government at the time of their migration to the United States respectively in 1891 and 1892.

4. That both defendants reside in Charleston, S. C., and have so resided since 1904, and that at the time of the commencement of this action they were subject to the jurisdiction of this Court.

5. That the defendant Albert Orth, as a condition to his naturalization and admission to citizenship, and in order to procure the same, represented that he was, at the time of his application therefor and had been for five years prior thereto, "behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same"; and that at the time of his naturalization and admission to citizenship, and as a condition thereof, he, the said Albert Orth, made oath in the usual and required form, declaring allegiance to the United States and foreswearing all allegiance to Germany, its sovereigns and rulers.

6. That the defendant Albert Orth was not, at the time of his application for naturalization, nor had he been for the five years immediately preceding, "behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same"; and at the time of his naturalization he, the said Albert Orth, did not bona fide, and without mental reservation, absolutely renounce and abjure all allegiance to Germany; his former country, and to the sovereigns or rulers thereof.

7. That, at the time of his naturalization and making of the oath of allegiance as aforesaid, the defendant Albert Orth did not really and truly intend to give true allegiance to the government of the United States, to support the Constitution and laws thereof against all enemies, foreign and domestic, and to bear true faith and allegiance to the same, but that he intended to and did retain attachment for and allegiance to Germany, its sovereigns and rulers.

8. That the said Albert Orth by means of the aforesaid false representations obtained naturalization and citizenship in the United States on November 8, 1900.

## Of Law

1. That the aforesaid representations of the defendant Albert Orth, concerning his behavior, feelings and intent, were false, fraudulent and illegal; and his said certificate of citizenship was fraudulently and illegally obtained, and should be delivered up, set aside and cancelled of record.

2. That the citizenship of Anna Orth, being derivative, falls with that of her husband Albert Orth.

It is so ordered.