## UNITED STATES v. ACKERMANN
### (two cases).

### SAME v. KEILBAR.

#### Civ. Nos. 132, 133, 150.

District Court, W. D. Texas,
Austin Division.

Dec. 7, 1943.

Ben F. Foster, U. S. Atty., and James McCollum Burnett, Asst. U. S. Atty., both of San Antonio, for the United States.

E. M. Grimes, of Taylor, Tex., for defendants Hans Ackermann, and others.

R. C. Wilson, of Austin, Tex., for defendant Frieda Ackermann.

KEELING, District Judge.

The three above-styled actions were consolidated for the purpose of trial. Each action is brought by the United States of America under the authority of 8 U.S.C. A. § 738, seeking the revocation of the order admitting the defendant to citizenship and cancellation of the certificate of naturalization on the ground of fraud and the illegal procurement of said certificate by reason of said fraud.

The allegations contained in the complaint in causes numbered Civil Action No. 132, United States of America v. Hans Ackermann, and Civil Action No. 150, United States of America v. Frieda Ackermann, are substantially the same in that the complaint avers that petitions for citizenship were filed in this court on January 25, 1938, the oath of allegiance was taken on June

14, 1938, and that the certificate of naturalization was issued by the clerk of this court on June 17, 1938. In Civil Action No. 133, United States v. Max Herman Keilbar, the complaint alleges the petition for naturalization was filed on October 14, 1932, the oath of allegiance was taken on November 14, 1933, and the certificate of naturalization was issued on November 17, 1933. The complaint in the Keilbar case differs from the complaints in each of the other two in that all proceedings were had in the State District Court of Williamson County, Texas. The allegations of fraud and of the illegal procurement of the certificate are substantially the same in each case.

The complaints each allege in substance that the actions are brought by the United States Attorney for and in behalf of the United States of America seeking the cancellation of certificates of naturalization. Complaints further allege that the defendants, and each of them, were born in Germany, that each filed a declaration of intention and, thereafter, each defendant filed his petition, took the oath of allegiance, and was issued a certificate of naturalization, as is set out above. It is further alleged that each defendant represented that he was attached to the principles of the Constitution of the United States and well-disposed to the good order and happiness of the United States, and that each stated in his petition that it was his intention to become a citizen of the United States of America and to renounce absolutely and forever all allegiance to any foreign prince, potentate, state or sovereignty, and particularly to the German Reich. The complaints further allege that each defendant took the oath of allegiance on the dates heretofore set out. Each of the allegations alluded to heretofore are admitted by each of the defendants. The complaints next aver that the petitions filed by each defendant were false and fraudulent in that they were not attached to the Constitution and did not intend to renounce all allegiance and fidelity to the German Reich. The complaints then allege that at the time each defendant took the oath of allegiance, he took the same falsely and fraudulently, in that he did not intend to absolutely and entirely renounce and abjure all allegiance to his native land, that he had a mental reservation that he would support and defend the Constitution and laws of the United States against all enemies, foreign and domestic, that he swore falsely that he would bear true faith and allegiance to the Constitution and laws of the United States and he swore falsely that he took the obligation freely, without any mental reservation or purpose of evasion, in that he had a mental reservation in connection with the entire oath. The complaints then allege that by fraudulent misrepresentations, declarations, statements and oath in connection with the petition and oath of allegiance, each defendant, with fraudulent intent, acquired his certificate of naturalization. The last allegations are expressly denied by each defendant and it is upon the issues raised thereon that a decision in these cases hinge. Undoubtedly the complaints are sufficient and the court has so ruled.

The decision of this court rests as a matter of fact upon what each defendant had in his mind and heart at the time of the filing of his petition and of the taking of the oath of allegiance. The question is: Were the statements in the petition truly or falsely made and was the oath of allegiance honestly taken, or was it tainted with a mental reservation?

Citizenship (in the United States of America) is a priceless possession and only on the basis of clear, unequivocal and convincing evidence should the court take away that which the naturalized citizen has obtained. If, however, the proof is such that the court feels bound to act upon it, he should unhesitatingly erase all evidence of fraud which had been perpetrated upon the courts.

The law is well-settled, and I hold, that the intent of a person at the time of the filing of the petition and of the taking of the oath can be determined by statements and actions of said person made and committed prior and subsequent to said dates. Especially is this true in times of stress or threatened war between their native and adopted countries, for it is then that the fidelity and allegiance come to light in the form of words and actions disclosing the real intent which had been fostered in the mind all the while.

Adolph Hitler became Chancellor of Germany in 1933 and had usurped the total powers of the Third Reich by 1936. In each succeeding year, the relationships between this country and the Third Reich became increasingly strained. These factors have a very important significance when viewed in the light of the evidence introduced during the trial of these causes.

Hans Ackermann and his wife, Frieda Ackermann, were married in Germany in

1923. In 1925 they emigrated to America and Hans Ackermann obtained employment as a printer in Giddings, Texas. In 1926 Hans Ackermann purchased a one-half partnership interest in the Taylor Herold, which was published in Taylor, Texas. The paper was a German-language newspaper of long standing. In 1926 Max Keilbar, the brother of Frieda Ackermann, came to this country, and has lived with his sister and brother-in-law until the present time. He was immediately employed by the Taylor Herold, which employment continued until he became a partner with Hans Ackermann. Beginning in 1938, Hans Ackermann and Max Keilbar each owned a full one-half partnership share in the paper and retained such interest until the paper ceased publication. The very close relationship of all three defendants by blood and marriage, the community of interests in connection with the conduct of the printing business and their living together beneath the same roof for a period of over sixteen years, is of great weight in the consideration of their individual cases.

At least since 1932 Hans Ackermann was a publisher of the paper, and from the early part of 1938 Max Keilbar was the editor and co-owner thereof. As editors and/or publishers, Hans Ackermann and Max Keilbar were responsible for the utterances published, at least during the time so connected with the paper. United States of America v. Albert Orth and Anna Orth, District Court of South Carolina, 51 F.Supp. 682. Keilbar's purchase of a partnership share in the paper is evidence that he supported fully its pro-German principles. His connection with the paper began in 1926 and this fact, together with his close business and domestic ties with the other defendants, lead to the inescapable conclusion that he heartily agreed with its policy. Regardless of the official responsibility of the editors and publishers for the articles contained in the paper, I am convinced that the expressions of the paper were those of each of the named defendants. Frieda Ackermann testified that she alone was responsible for the articles written by her and others published in the paper in the column headed "Plauderei".

The paper originally was the Taylor Herold. It later became the Taylor Herold-Waco Post. In 1937 the name of the paper was changed to the Texas Herold, which name it bore until it ceased publication in June of 1942. The paper was a weekly and was published in the German language. The government introduced into evidence all weekly publications of said paper from December of 1935 until the middle of June of 1942. The Government produced an expert translator who testified in English to the content of articles written in the German language. There were more than one hundred and fifty different articles introduced.

Because of the connection of each defendant thereto, it is important to arrive at the principles and aims of the paper.

Throughout the period of time from 1935 until December 7, 1941, the paper extolled the virtues of Hitler and Germany.

In the issue of October 1, 1936, a published article read in part, "We German-Americans can be proud of the Germany of today and its glorious Fuhrer whose honor and deeds no one has been able to dispute. He is a man who knows no equal in the world. Heil Hitler."

In the issue of May 26, 1938, the paper published an article declaring that "Hitler and Mussolini are the vengeance of the most high on the criminal nations". Frieda Ackermann testified that she wrote said article and that by "criminal nations" she meant England, France and Russia.

In the issue of March 13, 1938, there was an article which compared Hitler with Christ in the following language, "The example that Christ gave humanity through his earthly life can teach them nothing. Their hearts are cold and unfeeling. They know him not and cannot understand him, and the result of this is that some disregard him, while to others he is a thorn in the flesh for he ruins many a chance for them, makes them uneasy, knocks on their conscience and reminds them of the hour of reckoning, and for this reason they persecute him and want to be rid of him—yes, at that time they nailed him to the cross: And yet it was of no avail. Thus it was with the pure and stainless one who wanted to save humanity, and it is the same today, only applied to secular matters, with the savior of the German Land and the people. They can not accuse him of any fault; he lives an exemplary life, embodies all human ideals, represents right and liberty; when he speaks to his people and before the world, there is no offensive word in his speech. Adolph Hitler stands on the basis of German right and for this reason they can find no fault in him."

Throughout the time from 1936 to the latter part of 1941 the paper published

numerous articles advocating the blood theory. On August 11, 1938 (and shortly after the Ackermanns had been admitted to citizenship), an article was published in the paper which read in part, "Hearts of Germans even outside of the Reich are beating for Hitler." In the issue of February 17, 1938, an article stated in part, "For what does the question of citizenship have to do with the cultivation of the German cultural inheritance". In the issue of October 7, 1937, the paper published, "There are Germans not only in Germany; there are Germans in all the world. Germany in this sense is not a nation but a people." In the issue of November 25, 1937, an article read in part, "Peoples bound by blood are the highest things God created." In the issue of September 10, 1936, an article read, "We are always connected with Germany through the bonds of blood; we never get away from them, nor should we ever get away from them, not even as good American citizens * * *. We are obligated to America, but we are also bound to Germany, and the bonds of blood and race unite us to Germany in just as great a manner as we take our duties of American citizenship."

The policy of the paper in the so-called blood theory can be well summarized by the motto of the paper which it carried for many years, "Our ancestors created us in their blood, we can not escape! And we carry in our hearts Germanism which is great and eternal."

■ As was held in the case of United States v. Kuhn, D.C., 49 F.Supp. 407, 414, "The allegiance contemplated by our law is not to blood, or to race, or to creed. It is the obligation of fidelity and obedience to the government in consideration for the protection that government gives."

Other numerous articles in the paper advocated and defended the policy of Hitler in uniting within physical boundaries the Germans in the Sudetanland, Czecho-Slovakia, Poland and Austria.

The paper condemned the Treaty of Versailles and referred to President Wilson as a "Judas Iscariot".

The paper published many articles which were written in Germany, which were of propaganda nature. Other articles referred to President Roosevelt as the "chronic war monger" and condemned the policy of cooperation with England. The paper predominately advocated the ideals of Germany and Germanism and condemned all democratic principles.

An article published in the paper on November 4, 1937, was introduced disclosing that the paper had found its place in the Hall of Press and Propaganda in Stuttgart, Germany, and on December 9, 1937, the paper published an article directed to the Hansa University of Hamburg, which read in part, "From now on the Texas Herold will be sent to you regularly every week and it should make us happy if it is received in your newspaper file as the German Texas newspaper that is most outstanding for the Third Reich."

Over a period of years between 1936 and 1940 the papers received gratuitously picture mats from the Orbis Photo and Trans-Atlantic Photo of Hamburg, Germany, from which mats a full page of pictures was printed in the paper under the heading, "Pictures from the Old Homeland". The paper received directly from Germany news services, German-published propaganda articles and pamphlets. From time to time advertisements were printed in the paper advocating investments in German Bonds. Articles appeared in the paper which upheld the organization and principles of the German-American Bund and the paper was, from about 1937 until 1940, the official organ of the Kyffhauser Bund. The paper was without a doubt un-American.

Hans Ackermann was a member of the Kyffhauser Bund and he and Frieda Ackermann attended many functions of said organization. There is some evidence that at least on one occasion Max Keilbar attended a meeting of the Kyffhauser Bund in Houston. As stated in the opinion of Judge Hannay, District Judge for the Southern District of Texas, in the case of United States v. Reitzen, D.C., 50 F.Supp. 301, 302, when speaking of the Kyffhauser Bund and its predecessor in name, the Steel Helmets (Stahlhelm), "These two organizations are both unquestionably pro-German and un-American".

There was a close relationship between the three defendants involved in the cases on trial and German Consuls Dr. E. Wendler and Baron Von Spiegel. From the undisputed evidence, Dr. Wendler made at least two trips to Taylor, where on each occasion he sought out Hans Ackermann, and on those occasions met with the other two defendants. Two meetings in Austin occurred between Baron Von Spiegel and

Hans and Freida Ackermann. The meetings were at the request of the Baron. Von Spiegel made at least one visit to Taylor and there met with the three defendants. The calling card of Baron Von Spiegel was found in the home occupied by the three defendants, which bore a pencilled notation on the reverse side, "No cheap victory for Britain, lack of ammunition".

In the latter part of 1938, or the first part of 1939, the defendants were sought out in Taylor by G. Wilhelm Kunze, who advised them he was there in the interests of the German-American Bund. At that time Kunze was a high official of the Bund and he later became Bundsfuhrer by succeeding Fritz Kuhn. Kunze made at least three trips to Taylor and on each occasion met with the defendants. On the third visit, Kunze requested Hans Ackermann to call together a meeting of persons of German extraction within the immediate vicinity of Taylor for the purpose of talking to them about the Bund. Hans Ackermann drove in and about Taylor summoning persons for the purpose of hearing Kunze. The meeting was held at the home occupied by the defendants and was attended by some eight or nine persons other than the defendants themselves. At the meeting Kunze addressed the group, advising them he was there in the interests of the German-American Bund and wished to form a unit in Taylor. Kunze asked each of the parties present to form the nucleus of the unit and advised them to obtain more members. Kunze, on individual cards, noted the personal history of those persons present, purportedly for the purpose of organizing the group. Fritz Bleidiessel (now a sergeant in the armed forces of the United States) was present at the meeting, but refused to give Kunze any information, stating that he wanted to have nothing to do with the German-American Bund. Bleidiessel then abruptly left the meeting. Each of the three defendants remained at the meeting until its close.

There was introduced into evidence a card found in the National Headquarters of the German-American Bund in New York which bore the name of Hans Ackermann of Taylor, Texas. There was also introduced into evidence a mailing sheet, which was found among the papers of the National Bund Headquarters, disclosing that certain orders of the German-American Bund had been sent by the organization to Taylor, Texas. The government produced upon the trial William Luedtke, formerly National Secretary of the German-American Bund, who testified that the mailing list denoted that there was a unit of the Bund in Taylor, Texas. Though there is no direct evidence that any or all of the defendants were members of the German-American Bund, the circumstantial evidence is such as to point to a strong allegiance if not a direct connection with that un-American organization.

In 1937 Max Keilbar went to Germany and attended the Nuremburg conference. He was admitted upon a press pass given him by German officials because of his representing the Texas Herold. He sat in a special section and reported the proceedings in glowing terms from a German point of view. His articles were published in the Herold in 1937. They express his pro-German sentiments and loyalty.

In 1939 Hans and Frieda Ackermann were sent tickets for a trip to Germany. It is evident from the record that the trip was financed and sponsored by the V. D. A. (Volkesbund Das Deutschum Im Ausland). That organization was for the promotion of Germany and Germanism to those abroad, and was a part of the Ministry of Propaganda and Enlightenment. (Such ministry was and is headed by Joseph Paul Goebbels.) Many lectures were given the group by German officials. The group met Rudolph Hess, the then Deputy Fuhrer, in the Braun House; they were addressed by Conrad Henlein at Eger; Hans Ackermann placed on the grave of Horst Wessel a wreath (Horst Wessel was a martyr to the cause of National Socialism). At the outbreak of the war between Germany and Poland, the Ackermanns were in Germany and finally made their way back to the United States in October of 1939 upon an Italian liner. The value of the unused portion of the steamship tickets which they had gratuitously received was given them.

The government introduced into evidence articles found in the home occupied by the three defendants. A small swastika flag and an old German iron cross flag were among those effects. A swastika pin and an amber drinking glass with the inscription, "Ein Reich Ein Volk Ein Fuhrer" written thereon, three pictures of Adolph Hitler and numbers of other articles, consisting of German magazines of propaganda nature, over one hundred glossy photographs of high-ranking German

616

officials of propaganda nature, were also found and introduced. All of the articles introduced point to but one ideal—Hitler, Germany and Germanism. This conclusion is inescapable.

Each defendant offered himself as a witness and attempted to minimize the effect of the evidence. There was some evidence that after war was declared in December of 1941, the paper advertised the purchase of war bonds and stamps. There was at least one article calling for unity of all Americans against its enemies. This evidence does not impress the court in determining the mind and heart of the defendants on the dates alleged in the complaint.

■ There can be no divided allegiance. To become a true citizen through naturalization, the applicant must "absolutely and entirely" renounce and abjure all allegiance and fidelity to his native land. There can be no reservation in any particular and to any extent.

■ From the evidence, which, in my opinion, is clear, unequivocal and convincing, I find the allegations of the complaint true. It necessarily follows that the defendants, and each of them, were not and are not now entitled to and can not retain American citizenship. The United States of America is entitled to a judgment in each case.

The United States Attorney shall prepare findings of fact and conclusions of law. The defendants shall have one week from the date such proposed findings and conclusions are submitted to them within which to file objections thereto. The judgment of the court will be entered thereon.